UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: March 17, 2016
```

STEVEN T. FRANKLIN,

                Plaintiff,

  -against-

LIBERTY LINES TRANSIT, INC., JERRY
D'AMORE, THOMAS MURPHY, NEIL
ERICKSON, DENNIS ZOTTOLI, RICK
ERICKKSON, and KEVIN CLIFFORD,

                Defendants.

No. 13-cv-6701 (NSR)

OPINION & ORDER

NELSON S. ROMÁN, United States District Judge

Plaintiff Steven Franklin asserts claims against his former employer, Liberty Lines

Transit, Inc. ("Liberty"), and certain of Liberty's employees (collectively, "Defendants") arising

out of the termination of his employment on March 28, 2012. Plaintiff alleges that Defendants

discriminated against him on the basis of his race in violation of Title VII of the Civil Rights Act

of 1964, 42 U.S.C. §2000e *et seq.* ("Title VII"), and the New York State Human Rights Law,

N.Y. Exec. Law § 290 *et seq.* ("NYSHRL"). Plaintiff also alleges violations of 42 U.S.C. §§

1981, 1983, 1985, and 1986 arising out of the same set of operative facts.

Before the Court is Defendants' motion for summary judgment. For the following

reasons, Defendants' motion is GRANTED.

## BACKGROUND

The following facts are taken from the parties' respective Local Civil Rule 56.1

submissions,[1] exhibits, declarations, and affidavits.

---

[1] Plaintiff's 56.1 Statement is deficient in many respects, requiring the Court to deem a significant number
of Defendants' statements of fact admitted for purposes of this motion. First, many of Plaintiff's denials do not cite
to evidence or specifically controvert Defendants' proposed undisputed statements of fact. Others are largely

Plaintiff, an African-American, was employed as a bus driver for Liberty from December 7, 2007 to March 28, 2012. (Pl.'s 56.1 ¶ 1.) Plaintiff was terminated by Liberty for theft of overtime and falsification of company records. (*Id.* ¶¶ 1-3.) The events leading to Plaintiff's termination are as follows.

On Sunday, November 27, 2011, Plaintiff was scheduled to make his final stop on his route at 8:20 p.m., after which he was to travel directly to Liberty's garage (the "Garage"), arriving at 8:40 p.m. (*Id.* ¶ 11.) Plaintiff made his final stop five minutes late, at 8:25 p.m., but did not arrive back at the Garage until 9:00 p.m., and did not exit his bus until 9:08 p.m. (*Id.* ¶ 12.)[2] Although Plaintiff arrived only five minutes late to his final stop, he listed on his day card[3] that he left his final stop twenty-four minutes late, and that he did not arrive back at the Garage until 9:50 p.m. due to "not enough time, sporadic traffic and elderly passengers." (*Id.* ¶ 13.)[4]

Liberty uses a variety of mechanisms to determine the accuracy of its drivers' day cards, including video recordings from the buses, radio reports showing the actual times drivers reached their stops, logs of unusual circumstances on the road each day, and fare box reports showing the fares paid, including discounted fares used by elderly or disabled passengers. (*Id.* ¶¶ 8-10.)[5]

---

unresponsive to Defendants' assertions. Second, at least some of the evidence cited by Plaintiff does not support the contradictory statements he proffers. Statements falling into these categories will be deemed admitted for purposes of this motion pursuant to Loc. Civ. R. 56.1(c)-(d). Finally, Plaintiff asserts in response to a number of Defendants' statements that he does not have the specific knowledge or information necessary to admit or deny the statement. Such responses function as admissions under Loc. Civ. R. 56.1. *See Universal Calvary Church v. City of New York*, No. 96 CIV. 4606 (RPP), 2000 WL 1745048, at *2 n.5 (S.D.N.Y. Nov. 28, 2000); *Aztar Corp. v. NY Entertainment, LLC*, 15 F. Supp. 2d 252, 254 n.1 (E.D.N.Y. 1998).

[2] Plaintiff does not cite to any evidence in support of his denial of this statement.

[3] A driver's "day card" contains his or her trip schedule each day. The driver is required to record the times at which he or she arrives at certain points along the route. If the driver finishes a route behind schedule, he or she may request overtime by writing the reason(s) for the delay on the card, assuming the reason(s) are valid. Valid reasons include, among others, traffic, accidents, police incidents, personal emergencies, and inclement weather. Upon returning to the Garage at the end of the route, the driver hands the day card to the dispatcher. (Pl.'s 56.1 ¶ 6.)

[4] Plaintiff does not cite to any evidence in support of his denial of this statement and his counterstatement does not specifically controvert Defendants' statement.

[5] Plaintiff does not cite to any evidence in support of his denials of these statements.

2

Dennis Zottoli, the Labor Relations Manager for Liberty, ultimately reviewed Plaintiff's request for overtime. (*Id.* ¶ 20.) As part of his review, Zottoli gathered video recordings from Plaintiff's bus and the Garage, radio reports, and fare box reports. (*Id.*)

The video camera on Plaintiff's bus established that Plaintiff arrived at his final station at 8:25 p.m., with passengers having completely exited the bus by 8:27 p.m. (*Id.* ¶ 14.) Plaintiff then conversed with a female passenger from 8:28 p.m. until just before 8:45 p.m., when he closed the bus' doors and began his return trip to the Garage. (*Id.*)[6] Plaintiff did not note on his day card that he left his final stop late because he was speaking with a passenger. (*Id.* ¶ 16.) Plaintiff was seen on another video camera arriving at the Garage at 9:00 p.m., where he then conversed with another Liberty employee until 9:08 p.m. while still "on the clock." (*Id.* ¶ 17.)[7]

The radio report for Plaintiff's route that day did not indicate any delays or deviations from Plaintiff's schedule until his final stop. (*Id.* ¶ 22.)[8] Nor did the reports indicate any heavy traffic on the roads during Plaintiff's route. (*Id.* ¶ 23.)[9] Finally, the fare box report for Plaintiff's route only contained three fares for senior citizens and/or disabled individuals that day. (*Id.*)

Zottoli also reviewed Plaintiff's day cards for subsequent Sunday trips following November 27, 2011. Plaintiff requested overtime on each card and provided the same exact reasons for overtime as he did on November 27 – not enough time, elderly passengers, and sporadic traffic. (*Id.* ¶ 26[10]; Affidavit of Dennis Zottoli, Ex. 2 at D00116-117 (discussing three subsequent Sunday trips and Plaintiff's requests for overtime).)

---

[6] Plaintiff does not cite to any evidence in support of his denial of this statement and his counterstatement does not specifically controvert Defendants' statement.

[7] *See* Footnote 6.

[8] *See* Footnote 6.

[9] *See* Footnote 6.

[10] *See* Footnote 6.

3

Following his investigation, Zottoli recommended that Plaintiff be discharged for theft of overtime. (*Id.* ¶ 28.)[11] Before Plaintiff's discharge could be finalized, however, he was entitled to a three-step hearing process under his union's collective bargaining agreement, which included first and second level internal hearings, followed by arbitration before one of five pre-selected, impartial arbitrators. (*Id.* ¶ 30.) Plaintiff availed himself of both internal hearings, which he attended with his union representatives, as well as arbitration. (*Id.* ¶ 31.)[12]

At Plaintiff's first level hearing, he told Liberty that he did not remember why he wrote 9:50 p.m. on his day card. (*Id.* ¶ 32.) At the conclusion of the hearing, Liberty recommended discharge for theft of overtime and falsification of company records. (*Id.* ¶ 34.) Following the hearing, Plaintiff told his union that a Liberty dispatcher may have written 9:50 p.m. on his day card. (*Id.* ¶ 33.)

Plaintiff revised his explanation in his second level hearing, where he admitted that although he wrote 9:50 p.m. on his day card, he was tired and meant to write 8:50 p.m. (*Id.* ¶ 35[13]; Declaration of Donald S. Krueger, Ex. 15 at ¶¶ 25-26.) Defendants contend that even if Plaintiff had written 8:50 p.m., it too would have been a fabrication because Plaintiff could not have left his final stop at 8:45 p.m. and reached the Garage by 8:50 p.m., when the trip takes at least twenty minutes without traffic. (*Id.*) Liberty upheld Plaintiff's discharge after the second level hearing and his employment was terminated. (*Id.* ¶ 36.)

Plaintiff challenged his termination in arbitration, as allowed for under the collective bargaining agreement. (*Id.* ¶¶ 2, 30.)[14] At the arbitration, Plaintiff was represented by his

---

[11] *See* Footnote 6.
[12] *See* Footnote 6.
[13] *See* Footnote 6.
[14] Plaintiff disputes this paragraph of Defendants' 56.1 statement on other grounds.

personal attorney, as well as union representatives and their attorney. (*Id.* ¶ 2.)[15] On August 20, 2012, after hearing evidence and reviewing the proffered exhibits, the arbitrator upheld Plaintiff's termination, finding that he had falsified entries on his day card and was guilty of stealing overtime. (*Id.* ¶ 3.) On November 19, 2012, Plaintiff sought to vacate the arbitration award in New York state court, but ultimately dismissed his petition voluntarily. (*Id.* ¶¶ 37-38.)

Plaintiff also filed two other complaints against Liberty. On May 1, 2012, Plaintiff filed an Unfair Labor Practice Charge with the National Labor Relations Board ("NLRB"), alleging that Liberty fired him because of his union activities. (*Id.* ¶ 41.) The NLRB dismissed Plaintiff's charge on November 30, 2012, finding that there was "insufficient evidence to establish a violation." (*Id.* ¶ 42.) On October 1, 2012, Plaintiff filed a Charge of Discrimination against Liberty with the Equal Employment Opportunity Commission ("EEOC"), alleging that he was fired because of his race. (*Id.* ¶ 39.) The EEOC dismissed Plaintiff's charge on June 26, 2013 and provided him with a notice of his right to sue. (*Id.* ¶ 40.) This lawsuit followed.

## STANDARD ON A MOTION FOR SUMMARY JUDGMENT

Rule 56 of the Federal Rules of Civil Procedure provides: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of pointing to evidence in the record, "including depositions, documents [and] affidavits or declarations," *id.* at 56(c)(1)(A), "which it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party may also support an assertion that there is no genuine dispute by "showing . . . that [the] adverse party cannot produce admissible evidence to support the fact."

---

[15] *See* Footnote 14.

Fed. R. Civ. P. 56(c)(1)(B). If the moving party fulfills its preliminary burden, the onus shifts to

the non-moving party to identify "specific facts showing that there is a genuine issue for trial."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (internal citation and quotation marks

omitted). A genuine dispute of material fact exists when "the evidence is such that a reasonable

jury could return a verdict for the nonmoving party." *Id.* at 248; *accord Benn v. Kissane*, 510 F.

App'x 34, 36 (2d Cir. 2013) (summary order). Courts must "constru[e] the evidence in the light

most favorable to the non-moving party and draw[ ] all reasonable inferences in its favor."

*Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010) (internal

quotation marks omitted). In reviewing the record, "the judge's function is not himself to weigh

the evidence and determine the truth of the matter," nor is it to determine a witness's credibility.

*Anderson*, 477 U.S. at 249. Rather, "[t]he inquiry performed is the threshold inquiry of

determining whether there is the need for a trial." *Id.* at 250.

     Summary judgment should be granted when a party "fails to make a showing sufficient to

establish the existence of an element essential to that party's case, and on which that party will

bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. The party asserting that a fact is

genuinely disputed must support their assertion by "citing to particular parts of materials in the

record" or "showing that the materials cited do not establish the absence . . . of a genuine

dispute." Fed. R. Civ. P. 56(c)(1). "Statements that are devoid of any specifics, but replete with

conclusions, are insufficient to defeat a properly supported motion for summary judgment."

*Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999). The nonmoving party "may not

rely on conclusory allegations or unsubstantiated speculation." *FDIC v. Great Am. Ins. Co.*, 607

F.3d 288, 292 (2d Cir. 2010) (internal citation and quotation marks omitted). Moreover, "[a non-

moving party's] self-serving statement, without direct or circumstantial evidence to support the

charge, is insufficient to defeat a motion for summary judgment." *Fincher v. Depository Trust &*
*Clearing Corp.*, No. 06 Cv. 9959 (WHP), 2008 WL 4308126, at *3 (S.D.N.Y. Sept. 17, 2008)
aff'd, 604 F.3d 712 (2d Cir. 2010) (citing *Gonzales v. Beth Israel Med. Ctr.*, 262 F. Supp. 2d
342, 353 (S.D.N.Y. 2003)).

## DISCUSSION

### I.   Collateral Estoppel

The arbitrator determined that Plaintiff was terminated for theft of overtime.  Defendants
now argue that Plaintiff is precluded from re-litigating the reason for his termination in the
instant matter.  Plaintiff responds in a somewhat confusing manner, arguing that he is not
precluded from asserting a Title VII claim, but does not specifically address whether the reason
for Plaintiff's termination has already been decided and should not be re-litigated in this matter.

"Collateral estoppel, or issue preclusion, prevents parties or their privies from relitigating
in a subsequent action an issue of fact or law that was fully and fairly litigated in a prior
proceeding." *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 288 (2d Cir. 2002).  "Collateral
estoppel is . . . applicable to factual findings made in arbitration proceedings," *Andrea Doreen
Ltd. v. Bldg. Material Local Union 282*, 299 F. Supp. 2d 129, 145 (E.D.N.Y. 2004) (citing *Dean
Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 223 (1985); *Boguslavsky v. Kaplan*, 159 F.3d 715,
720 (2d Cir. 1998); *Benjamin v. Traffic Executive Ass'n E. Railroads*, 869 F.2d 107, 112 (2d Cir.
1989)), "even in the absence of judicial confirmation of the award." *Clarke v. UFI, Inc.*, 98 F.
Supp. 2d 320, 335 (E.D.N.Y. 2000) (citing *Benjamin*, 869 F.2d at 111-113).  Application of
collateral estoppel is appropriate if: "(1) the identical issue was raised in a previous proceeding;
(2) the issue was 'actually litigated and decided' in the previous proceeding; (3) the party had a
'full and fair opportunity' to litigate the issue; and (4) the resolution of the issue was 'necessary
to support a valid and final judgment on the merits.'" *Interoceanica Corp. v. Sound Pilots, Inc.*,

107 F.3d 86, 91 (2d Cir. 1997) (quoting *Central Hudson Gas & Elec. v. Empresa Naviera Santa S.A.*, 56 F.3d 359, 368 (2d Cir. 1995)).

Defendants proffer a number of reasons why the arbitration hearing was fair, including that Plaintiff was represented by his own personal attorney at the hearing and had the opportunity to call witnesses and cross-examine Liberty's witnesses; the hearing fully explored the reasons for the Plaintiff's discharge; and the arbitrator was well-respected and issued a detailed, written decision. (Defs.' Mot. at 13; Pl.'s 56.1 ¶¶ 2-3.)  Plaintiff also petitioned to overturn the arbitrator's award, but ultimately decided to voluntarily dismiss the petition.  (Pl.'s 56.1 ¶¶ 37-38.)

The Second Circuit dealt with a similar issue in *Hill v. Coca Cola Bottling Co. of New York*, 786 F.2d 550 (2d Cir. 1986).  In *Hill*, Clarence Hill, an African-American, challenged his termination from Coca Cola by filing: (1) an administrative complaint with the New York State Division of Human Rights, alleging that "the action taken against him was discriminatory because he was merely following a long-standing company policy for which white employees were not fired;" (2) a claim for unemployment insurance; and (3) a federal lawsuit alleging violations of Title VII and 42 U.S.C. §§ 1981 and 1983.  *Id.* at 551.  Hill's unemployment insurance application was denied following a finding by an administrative law judge that he was fired for misconduct.  The determination was upheld on appeal by the Unemployment Insurance Appeal Board of the New York State Department of Labor and New York's Appellate Division, Third Department.  In *Hill*'s federal lawsuit, the district court gave preclusive effect to the reason for *Hill*'s termination, but permitted his Title VII claim to survive.  The Second Circuit affirmed the decision, explaining that "[w]hile crime or other misconduct may be a legitimate basis for discharge, it is hardly one for racial discrimination." *Id.* at 553 (quoting *McDonald v. Santa Fe*

8

*Trail Transportation Co.*, 427 U.S. 273, 283 (1976)).  Thus, *Hill* makes clear that the Court may give preclusive effect to a factual determination of the reason for a plaintiff's termination, while permitting his Title VII claim to proceed.

Here, Plaintiff had a full and fair opportunity to litigate whether or not he stole overtime. The reason for Plaintiff's termination – theft of overtime – was squarely at issue; Plaintiff's own counsel[16] had the opportunity to present witnesses and cross-examine Liberty's witnesses (Pl.'s 56.1 ¶ 2); Plaintiff directly contested that he stole overtime, arguing that the false times listed on his day cards were the result of a mistake and that he did not intend to falsify his day cards or steal overtime, (Pl.'s Aff., Ex. I, at D00766); Plaintiff argued that Liberty failed to meet its burden of proof on the essential elements of theft of overtime – "intent and taking," (*id.* at D00767); and the arbitrator was required to determine whether Plaintiff stole overtime – the Defendants' proffered reason for his termination – in order to determine whether Plaintiff was fired for just cause.  (*Id.* at D00760.)

Plaintiff appears to argue that he should not be collaterally estopped from re-litigating the reason for his termination because he could not, and did not, raise a Title VII claim during the arbitration.  Defendants do not contend, however, that Plaintiff is barred from bringing a Title VII claim.  Defendants only assert that Plaintiff may not re-litigate the reason for his termination. (Defs.' Reply at 2.)  The Court agrees, as determining that Plaintiff was terminated for theft of overtime does not preclude him from bringing a Title VII claim, to the extent he can demonstrate that African-American employees were discharged for such misconduct, while employees of

---

[16] Although courts in this district have found that plaintiffs represented by union attorneys may not always receive a vigorous defense due to conflicts of interest with their union, *see Lynch v. Pathmark Supermarkets*, 987 F. Supp. 236, 242 (S.D.N.Y. 1997) *aff'd*, 152 F.3d 919 (2d Cir. 1998), Plaintiff was represented by his own personal attorney, removing any potential conflict of counsel in the arbitration.

different races, colors, and/or national origins were not. *See McDonald v. Santa Fe Trail Transp.
Co.*, 427 U.S. 273, 283 (1976) ("While Santa Fe may decide that participation in a theft of cargo
may render an employee unqualified for employment, this criterion must be applied, alike to
members of all races, and Title VII is violated if, as petitioners alleged, it was not.") (internal
citations and quotation marks omitted).

Accordingly, the Court finds that Plaintiff was terminated for stealing overtime and
Plaintiff is precluded from re-litigating the reason for his termination.

## II.    Federal and State Employment Discrimination Claims

Plaintiff's claims for racial discrimination under Title VII, the NYSHRL, and 42 U.S.C. §
1981 are analyzed under the *McDonnell-Douglas* burden-shifting framework. *See McGill v.
Univ. of Rochester*, 600 F. App'x 789, 790 (2d Cir. 2015) (citing *Ruiz v. Cnty. of Rockland*, 609
F.3d 486, 491 (2d Cir. 2010), *Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010)).  To
establish a *prima facie* case of discrimination, a plaintiff must establish that: (1) he belongs to a
protected class; (2) he was qualified for the position at issue; (3) he suffered an adverse
employment action; and (4) the adverse employment action occurred under circumstances giving
rise to an inference of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802
(1973). The burden then shifts to the defendant "to articulate some legitimate, nondiscriminatory
reason" for the plaintiff's termination. *Id.* If the defendant proffers a non-discriminatory reason
for the termination, the presumption falls away, and summary judgment for the defendant is
appropriate "unless the plaintiff can point to evidence that reasonably supports a finding of
prohibited discrimination." *James v. New York Racing Ass'n*, 233 F.3d 149, 154 (2d Cir. 2000)
(internal citations omitted). "The ultimate burden of persuading the trier of fact that the
defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff,
and if the plaintiff has failed to show that there is evidence that would permit a rational factfinder

10

to infer that the employer's proffered [nondiscriminatory] rationale is pretext, summary judgment dismissing the claim is appropriate." *Patterson v. Cnty. of Oneida, N.Y.*, 375 F.3d 206, 221 (2d Cir. 2004) (internal citations and quotation marks omitted).

### A.  *Prima Facie Case*

Defendants do not dispute that Plaintiff belongs to a protected class and suffered an adverse employment action.  Defendants dispute, however, that Plaintiff is qualified for his position and that the adverse employment action occurred under circumstances giving rise to an inference of discrimination.

### 1.  *Plaintiff Is Not Qualified For His Job*

In order to demonstrate that he was qualified for his job, Plaintiff "must show that he was qualified for the position at the time of the discharge, regardless of whether he had performed the position satisfactorily in the past." *Dawkins v. Witco Corp.*, 103 F. Supp. 2d 688, 696 (S.D.N.Y. 2000) (citing *Powell v. Syracuse Univ.*, 580 F.2d 1150, 1155 (2d Cir.) *cert. denied*, 439 U.S. 984 (1978) (to establish the second prong of his *prima facie* case, plaintiff must show that "his performance was of sufficient quality to merit continued employment."))  Defendants contend that Plaintiff's theft of overtime from Liberty makes him unqualified for the position, as "bus drivers must accurately report the time they worked for which they are compensated." (Defs.' Mot. at 14.)  Courts in this Circuit have recognized that theft from an employer does not equate to satisfactory job performance. *See Crews v. Trustees of Columbia Univ. in City of New York*, 452 F. Supp. 2d 504, 522 (S.D.N.Y. 2006) ("'Satisfactory performance' by definition does not include theft.")

It is irrelevant that Plaintiff is purportedly an experienced "bus operator, having worked for multiple bus companies during the same time period of his employment with Liberty Lines." (Pl.'s Opp. at 15-16.)  The sole question for the Court is whether Plaintiff was qualified at the

11

time of his discharge. Here, the arbitrator found that Plaintiff stole overtime. This Court determined that Plaintiff is precluded from re-litigating that issue. Thus, at the time of his discharge, having been found to have stolen overtime, Plaintiff was not qualified for his position as a bus driver at Liberty.

The Court recognizes the inherent challenge a plaintiff faces in bringing a Title VII claim where, as here, the plaintiff is found unqualified for his position, but alleges that similarly situated individuals of different races and/or colors who violated company policy, and thus were equally unqualified for their positions, were not terminated for the same offense. The Supreme Court has made clear that a Title VII claim could exist in such circumstances. *McDonald*, 427 U.S. at 283 ("While Santa Fe may decide that participation in a theft of cargo may render an employee unqualified for employment, this criterion must be applied, alike to members of all races, and Title VII is violated if, as petitioners alleged, it was not.") Here, however, the Court need not determine how Plaintiff's claim could proceed without making a complete *prima facie* showing under *McDonnell-Douglas*, as Plaintiff fails to show an inference of discrimination necessary to establish the final piece of his *prima facie* case.

### 2.    *Plaintiff Has Not Shown An Inference Of Discrimination*

Defendants contend that there is no evidence in the record giving rise to an inference of discrimination. In response, Plaintiff asserts that "Defendants' favorable treatment of Caucasian employees suspected of theft of overtime in contrast to their harsh treatment of African American employees suspected of the same offense, is indicative of Defendants' discriminatory intent." (Pl.'s Opp. at 17.)

"[A] showing that the employer treated plaintiff less favorably than a similarly situated employee outside his protected group . . . is a recognized method of raising an inference of discrimination for purposes of making out a *prima facie* case." *Humphreys v. Cablevision Sys.*

*Corp.*, 553 F. App'x 13, 14-15 (2d Cir. 2014) (quoting *Mandell v. County of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003)) (internal quotation marks omitted).  Plaintiff must demonstrate, however, that he was similarly situated in all material respects with the proposed comparator.  *Id.* at 15.  Plaintiff proffers four Caucasian employees as comparators -- Kenneth Roth, Ignazio Longhitano, Michael Novak, and Robert Dingman.  (Pl.'s Opp. at 18.)  The Court will discuss each individual in turn.

### Kenneth Roth

Roth, a Caucasian bus operator, was investigated for submitting questionable overtime requests.  On August 25, 2010, a Liberty supervisor observed Roth's bus parked on the side of the road after completing his route, but prior to returning to the garage.  Roth requested twelve minutes of overtime upon returning to the garage.  (Pl.'s 56.1 ¶ 63; Pl.'s Aff., Ex. K at D00740.)  As a result of his overtime request, a Liberty supervisor followed Roth during his route the next day.  (*Id.*)  The supervisor observed Roth arrive at the garage ahead of schedule, but Roth still requested ten minutes of overtime.  (*Id.*)  During a first level hearing regarding his requests for overtime, Roth explained that: (1) he pulled over his bus on August 25, 2010 to rewrite a vehicle condition report and to perform his required interior check of the bus, and (2) there was a backup at the fuel line on August 26, 2010 that delayed him for a few minutes upon returning to the garage, after which he had to complete his post-trip inspection.  (*Id.*)  There were no allegations that Roth falsified any of the contents of his day card.  Liberty accepted his explanation and did not take further action.  (*Id.* at D00741.)

### Ignazio Longhitano

Longhitano, a Caucasian bus operator, was investigated for submitting questionable overtime requests.  On August 2, 2008, a Liberty supervisor observed Longhitano's bus parked

on the side of the road for roughly ten minutes during the final trip of his route. (Pl.'s Aff., Ex L at D00731.) Although the bus was in service, there were no passengers aboard. (*Id.*) When Longhitano returned to the garage, he requested eleven minutes of overtime for "traffic." (*Id.*) The Liberty supervisor inquired with Liberty's Radio Desk to determine whether Longhitano had notified it of his unscheduled stop. (*Id.*) When the Radio Desk reported that it had no information concerning the stop, Liberty chose to investigate the matter further. (*Id.*) During a first level hearing on the issue, Longhitano explained that he stopped to use the restroom. (*Id.*) Because no passengers were left on the bus, he did not complete his drop-off-only route and took an alternative route back to the garage. (*Id.*) There were no allegations that Longhitano falsified any of the contents of his day card. Liberty accepted his explanation and did not take further action. (*Id.*)

### Michael Novak

Novak, a Caucasian bus operator, was investigated for submitting questionable overtime requests. On May 20, 2008, after completing his final stop, a Liberty supervisor observed Novak pull his bus over to the side of the road on his way back to the garage. (Pl.'s 56.1 ¶ 61; Pl.'s Aff., Ex. M. at D00729.) When Novak returned to the garage, he requested seven minutes of overtime for "traffic." (*Id.*) Because Novak was on time at his final stop, Liberty inquired why his return to the garage was delayed. (*Id.*) During a first level hearing on the issue, Novak explained that he pulled over to perform his post-trip inspection, which he could not do at his last stop because he would have blocked traffic. (*Id.*) He explained that he performs the same routine every evening. (*Id.*) There were no allegations that Novak falsified any of the contents of his day card. Liberty accepted his explanation and did not take further action. (*Id.*)

14

Robert Dingman

Dingman, a Caucasian bus operator, was investigated for reports of unnecessary overtime and non-compliance with certain reporting requirements and a supervisor's directives. (Pl.'s 56.1 ¶ 53; Zottoli Aff., Ex. 13 at D00748.) There are three relevant incidents with regard to reports of unnecessary overtime. On March 30, 2011, a Liberty employee observed Dingman's bus parked unattended in an unauthorized location, without Dingman visibly present. (*Id.*) The employee investigated, asking Dingman why he was returning to the garage via an unauthorized route. Dingman responded that it was quicker than his authorized route. (*Id.*) Upon returning to the garage, Dingman requested sixteen minutes of overtime for traffic. (*Id.*) On April 12, 2011, a Liberty supervisor followed Dingman on his route. Dingman arrived at his final stop two minutes early, but remained there for an additional nine minutes before returning to the garage, arriving eight minutes late. (*Id.*) Dingman requested seventeen minutes of overtime for this trip. (*Id.*) Finally, on April 19, 2011, Dingman was followed by another Liberty supervisor, who observed Dingman stop and leave his bus on three occasions, returning with a newspaper on two of the occasions. (*Id.*) Following a first level hearing, Dingman was discharged for theft of overtime, among other reasons.

During a second level hearing, Dingman explained that he had legitimate reasons for his delays and overtime requests. On March 30 and April 19, Dingman had to stop to use the restroom due to a deteriorating health condition. He explained that he felt compelled to buy something in the stores when he used their restrooms, and a newspaper was the least expensive item he could purchase. (*Id.*, Ex. 14 at D00752.) While driving his bus on April 12, Dingman received a phone call from his daughter, who had been ill. (*Id.*, *see also* Pl.'s Aff., Ex. 13 at D00748-749.) Dingman did not answer the phone while driving, but waited to return the call

until after he completed his route. (*Id.*) In light of these explanations, Liberty "reluctantly rescind[ed] the discharge," but issued Dingman a one-month suspension and final warning for theft overtime. (*Id.*, Ex. 14 at D00753.) Liberty noted that "[t]he decision [was] without precedent." (*Id.*)

Thomas Murphy, Liberty's Vice President of Operations who conducted the second level hearing, testified in connection with this matter that Dingman was not terminated because "he was honest in the hearing" and had "mitigating circumstances," including that if he were terminated "he would lose his wife and his house." (Pl.'s Aff., Ex. B at 103:7-18.)

There were no allegations that Dingman falsified any of the contents of his day card.

Comparisons to Plaintiff

Although Plaintiff's conduct does not need to be identical to his comparator or comparators, there must be an "objectively identifiable basis for comparability . . . [that is] a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases." *Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000) (internal citation and quotation marks omitted). Plaintiff fails to make such a showing here.

It is undisputed that Plaintiff was terminated for falsifying entries on his day card to procure unearned overtime. (Pl.'s 56.1 ¶¶ 1, 3.) There is, however, no evidence in the record that his comparators were alleged to have falsified entries on their day cards, whether intentionally or unintentionally, in an attempt to procure unearned overtime. Instead, each comparator was investigated for requesting overtime to which they were purportedly not entitled, but for which they properly and accurately entered their actual trip times and justifications for overtime. On this basis alone, the Court could find that the comparators are not similarly situated to Plaintiff in all material respects.

Moreover, each of the comparators provided a justification for their requested overtime, including the need to use a restroom, fill out a vehicle condition report, conduct a post-trip inspection, or make an emergency phone call of a personal nature. None of the comparators provided alternative or shifting justifications for their actions. Plaintiff, however, has offered a number of justifications for recording the incorrect time on his day card. At his first level hearing, Plaintiff claimed that the recording was an "honest error" and that he could not remember why he entered 9:50 p.m. on his day card. (Pl.'s 56.1 ¶ 32.) Following his hearing, Plaintiff told his union that a Liberty dispatcher may have been responsible for entering 9:50 p.m. on his day card. (*Id.* ¶ 33.) At the second level hearing, Plaintiff admitted that he wrote 9:50 p.m. on his day card, but stated that he was tired and meant to write 8:50 p.m. (*Id.* ¶ 35; Declaration of Donald S. Krueger, Ex. 15 at ¶¶ 25-26.) Plaintiff's shifting explanations further distinguish his case from the cases of his comparators.

Plaintiff cautions the Court not to construe the characteristics of his proposed comparators too narrowly, arguing that "Defendants' discriminatory practices begin at the level where the decision is made to investigate and charge employees for disciplinary violations." (Pl.'s Opp. at 17.) In the same vein, Plaintiff states in his 56.1 statement with regard to comparators Novak and Longhitano that "Defendants arbitrarily accepted [the comparators'] explanation[s] and maintained [their] employment without any further inquiry or investigation as [they were] not African American." (Pl.'s 56.1 ¶¶ 61-62.) Having given due consideration to Plaintiff's argument, the Court finds it unavailing.

First, despite Plaintiff's contentions to the contrary, Liberty conducted further inquiry and/or investigation into three of the four comparators' actions prior to bringing charges against them and holding hearings. Liberty assigned supervisors to follow Roth and Dingman on

subsequent trips and inquired of the Radio Desk with respect to Longhitano's unscheduled stop. It is clear on the face of the record that Caucasian employees were also subject to pre-hearing investigations. Moreover, there is no evidence in the record of any post-hearing investigations taking place in any case. Although Plaintiff alludes to as much in his 56.1 statements, even in Plaintiff's case Liberty's investigation was undertaken prior to bringing charges and scheduling his hearing. Explanations by the comparators at their hearings therefore have nothing to do with any investigations undertaken by Liberty. It appears that Plaintiff is confused as to the order in which the events occurred in each of the comparator's incidents.

Second, none of the explanations provided by the comparators were "arbitrarily accepted" by Defendants. "Arbitrary" is defined by the Webster's Dictionary as something that is "not based on reason or evidence." "Arbitrary," *Merriam–Webster's Dictionary, available at* http://www.merriam-webster.com/dictionary/arbitrary (last visited March 14, 2016). As summarized above, Liberty's decisions not to take further action against the proposed comparators were based on particularized reasons, justifications, and mitigating circumstances provided by the comparators. Although Plaintiff may not believe that these reasons were sufficient to justify Liberty's decisions, it cannot be said that Liberty's decisions were arbitrary.

Conspicuously missing from Plaintiff's discussion of comparators are the investigations of Lamont Carroll, William Hosley, and Anthony McPhail. Carroll, Hosley, and McPhail are African-American bus operators who were investigated for submitting unnecessary or questionable overtime requests. Carroll, like Longhitano and Dingman, explained that his overtime request was the result of a restroom stop. (Pl.'s 56.1 ¶ 54.)[17] Carroll's explanation was accepted and he was not terminated. (*Id.*) Hosley explained that his overtime request was the

---

[17] Plaintiff's conclusory denial of this paragraph of Defendants' 56.1 Statement, without citation to any evidence, requires the Court to deem it admitted for purposes of this motion.

result of needing to speak with a school's bus monitor about a child who had been misbehaving on his bus. (*Id.* ¶ 56.)[18]  Hosley's explanation was accepted and he was not terminated. (*Id.*)  Finally, McPhail requested overtime following a return trip to the garage in which he took the wrong return route. (*Id.* ¶ 57.)[19]  McPhail explained that he had been taking that route for several months without anyone telling him it was wrong and promised to take the correct route in the future. (*Id.*)  McPhail's explanation was accepted and he was not terminated. (*Id.*)

Ultimately, the comparators proffered by Plaintiff engaged in conduct materially different from Plaintiff's and are not sufficient comparators for purposes of his claims.  Moreover, Liberty's conduct with respect to Carroll, Hosley, and McPhail, among others, appears to contradict any inference of discrimination alleged by Plaintiff.  Thus, Plaintiff's failure to proffer any evidence sufficient to give rise to an inference of discrimination requires dismissal of his Title VII, NYSHRL, and § 1981 claims.

### B. Legitimate, Nondiscriminatory Reasons for Termination

Even assuming, *arguendo*, that Plaintiff established a *prima facie* case of discrimination, Defendants have proffered legitimate, nondiscriminatory reasons for Plaintiff's termination.  "An employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." *DeLuca v. Allied Domecq Quick Serv. Rests.*, No. 03 Cv. 5142 (JFB) (AKT), 2006 WL 1662611, at *9 (E.D.N.Y. June 13, 2006) (internal citation and quotation marks omitted).  Nevertheless, "an employer's explanation of its reasons must be clear and specific in order to afford the employee a full and fair opportunity to demonstrate pretext.  Where an employer's explanation, offered in

---

[18] *See* Footnote 17.
[19] *See* Footnote 17.

clear and specific terms, is reasonably attributable to an honest even though partially subjective [belief], no inference of discrimination can be drawn." *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 105 (2d Cir. 2001) (internal citations and quotation marks omitted).

Here, the record is replete with evidence that Plaintiff was terminated for theft of overtime and falsification of records following an investigation by Liberty and a multi-step hearing and appeal process. Moreover, as discussed in detail above, Plaintiff is precluded from re-litigating the reason for his termination. Accordingly, Plaintiff's theft of overtime and falsification of records constitutes a legitimate, nondiscriminatory basis for his termination. *See generally Pacenza v. IBM Corp.*, No. 04 Cv. 5831 (PGG), 2009 WL 890060 (S.D.N.Y. Apr. 2, 2009) *aff'd*, 363 F. App'x 128 (2d Cir. 2010).

### C. Pretext

Because Defendants have met their burden of production by offering evidence that Plaintiff was terminated as a result of Defendants' investigation and determination that Plaintiff stole overtime, the burden shifts back to Plaintiff to "show that the proffered reason was merely a pretext for discrimination, which may be demonstrated either by the presentation of additional evidence showing that the employer's proffered explanation is unworthy of credence, or by reliance on the evidence comprising the prima facie case, without more." *Heyman v. Queens Vill. Comm. for Mental Health for Jamaica Cmty. Adolescent Program, Inc.*, 198 F.3d 68, 72 (2d Cir. 1999) (internal citation and quotation marks omitted). "[T]he plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the 'motivating' factors." *Back v. Hastings On Hudson Union Free Sch. Dist.*, 365 F.3d 107, 123 (2d Cir. 2004) (internal citation and quotation marks omitted).

Plaintiff offers myriad arguments in support of his contention that Defendants' reasons for his termination are merely a pretext. Plaintiff argues, *inter alia*, that: Plaintiff's request for overtime was initially denied by Kevin Clifford, which would have eliminated the case against him, but Clifford's supervisor instructed him to approve the overtime in order to carry out an investigation for theft of overtime; Defendants did not inquire further into Plaintiff's reason – "a simple mistake" – for writing the wrong return time to the garage on his day card; there is no company policy preventing bus operators from speaking with passengers; Defendants failed to provide a way for Plaintiff to account for the time in which he was late, but was not requesting overtime; Defendants unreasonably rejected Plaintiff's offer to repay any overpayment in violation of the Operator's Handbook; and Caucasian employees similarly situated to Plaintiff did not have similar procedures initiated against them, were allowed to advance their reasons for time discrepancies, and had their charges disposed of on that basis. The Court discusses each in turn.

### 1.    *Initial Denial of Overtime*

Clifford testified that after reviewing Plaintiff's day card, he initially denied the overtime request because he knew the return trip from the final station on Plaintiff's route to the garage should have taken significantly less time than Plaintiff claimed. (Pl.'s Aff., Ex. F at 21:18-24.) Clifford then informed his supervisor, Len Procak, that he was denying the overtime request, but Procak told Clifford to authorize it. (*Id.* at 23:10-15, 25:12-22.) The entire conversation between Clifford and Procak lasted ten seconds. (*Id.* at 23:24.) Procak then instructed Clifford to give Zottoli a copy of Plaintiff's day card. (*Id.* at 26:9-23.)

At best, the testimony cited by Plaintiff demonstrates that Clifford generally denies overtime in such scenarios, but was overturned in this case for reasons unknown to Clifford. Plaintiff does not cite to, and the Court is not aware of, any evidence in the record that directly

states or even implies that Defendants approved the overtime in order to investigate Plaintiff because he is African-American.  And even if the overtime was approved in order to carry out an investigation into Plaintiff's potential theft of overtime, there would need to be at least a scintilla of evidence in the record that the change was motivated by race.  There simply is not.

Without any evidence supporting Plaintiff's contention, the Court cannot conclude that Defendants' approval of Plaintiff's overtime was pretextual and carried out for discriminatory reasons.

### 2.    *Further Inquiry Into Plaintiff's Explanations*

The testimony cited by Plaintiff suggests, at best, that Defendants did not further inquire about or investigate Plaintiff's claim, asserted at his first hearing, "that he did not known why he would have written that time and that it was a simple mistake."  (Pl.'s Opp. at 20.)  This fails to establish pretext for two reasons.  First, there is no evidence in the record that Defendants' purported failure to further investigate Plaintiff's claim was motivated by race.  Plaintiff provides absolutely no evidence of Defendants ever investigating the explanations or justifications offered by employees at disciplinary hearings.  Instead, the record clearly demonstrates that Defendants undertake any necessary investigation prior to bringing charges and holding hearings.  *See* Section II (2), *supra*, at 17-18 (explaining that Liberty investigated three of the four proposed comparators prior to bringing charges and did not conduct any post-hearing investigations).  Second, Plaintiff ignores the fact that he changed his explanation during the second level hearing, at which time he asserted that he meant to write 8:50 p.m., rather than 9:50 p.m.  (Pl.'s 56.1 ¶ 35; Declaration of Donald S. Krueger, Ex. 15 at ¶¶ 25-26.)  Having provided an explanation for his mistake, the Court cannot understand why Plaintiff believes Defendants should have further investigated why he wrote 9:50 p.m. on his day card.

### 3.   *Conversations with Passengers*

It is clear from Clifford's and Murphy's testimony that Liberty policy permits bus operators to converse with passengers regarding "business-related questions." (Pl.'s Aff., Ex. B at 20:6-8.) During Plaintiff's second level hearing, he stated that the conversation at issue related to "business," but could not recall the details of the conversation. Plaintiff did not dispute the duration of the conversation – fourteen minutes – or that it occurred after his route was complete. (Pl.'s 56.1 ¶ 15.) Nor did he explain why the conversation lasted for fourteen minutes. (*Id.*)

The Court is hard pressed to believe that Plaintiff's fourteen minute conversation, after his route had ended, was wholly related to Liberty's business. Plaintiff's inability or unwillingness to explain what the conversation was about or why it lasted so long strengthens this conclusion. Nevertheless, even assuming that Plaintiff's conversation was business-related and that Defendants' decision to terminate Plaintiff was based on an erroneous understanding of Liberty's policy, the decision to terminate Plaintiff is not unlawful absent some prohibited factor motivating Defendants' decision. The record is devoid of any evidence that Defendants enforced this policy as they did because of Plaintiff's race.

### 4.   *Accounting for Late Departures Without Claiming Overtime*

Defendants' testimony concerning which times should have been entered on Plaintiff's day card – the time at which Plaintiff *should have* left his final stop location or the time at which Plaintiff *actually* left his final stop location – is confusing and contradictory. Zottoli testified that Plaintiff should have listed the actual time he arrived at a specific location on his day card, rather than the time he should have arrived according to the schedule. (Pl.'s Aff., Ex. E at 62:18-24.) Murphy initially testified to the same, (*id.*, Ex. B at 51:24-25), but later in the same deposition stated that Plaintiff should have listed the time at which he should have left his final

23

stop location, rather than the time at which he actually left, because listing the latter would have been a request for overtime that Plaintiff did not earn. (*Id.* at 73:3-24; 82:9-15.)

The Court recognizes the challenge Plaintiff may have faced in determining the proper times to list in his day card in light of these seemingly conflicting requirements. Nevertheless, the testimony proffered by Plaintiff, and the record generally, fails to demonstrate that these requirements, whatever they may have been, were applied in a discriminatory way.

### 5.     *Plaintiff's Offer to Repay Unearned Overtime*

The testimony cited by Plaintiff outlines the procedure that bus operators should follow if they believe there is a shortage or overage in their pay. Although Plaintiff contends that Defendants unreasonably rejected his offer to repay any overpayment made, purportedly "as allowed by the Operator's Handbook," the proffered testimony fails to establish that the Operator's Handbook required Defendants to accept his offer, let alone that they were required to do so after charging him with theft of overtime. Nor is there anything in the proffered testimony or the record directly evidencing or implying that Defendants' refusal to accept Plaintiff's offer was motivated in any way by Plaintiff's race.

### 6.     *Disparate Treatment of Similarly Situated Employees*

Plaintiff concludes his pretext arguments by repeating the same arguments advanced in connection with his attempt to establish comparators for these claims. As discussed above, both Caucasian and African-American employees were permitted to provide explanations and justifications for questionable overtime requests at their hearings. *See* Section II (2), *supra*, at 18-19. Defendants accepted these explanations and did not take further action. *Id.* (discussing Defendants' acceptance of three African-American bus operators' explanations for their overtime requests). Moreover, similar procedures were applied to, and investigations were conducted into, both Caucasian and African-American employees. *Id.* at 17-18 (discussing that of the four

24

Caucasian comparators, Defendants assigned supervisors to follow two of the employees and inquired of the Radio Desk with respect to the third).

In short, there is simply no evidence to support Plaintiff's contention that race played any role in Defendants' investigations into, or hearings about, questionable overtime requests.

*     *     *

Even examining the totality of the circumstances surrounding Plaintiff's pretext arguments, rather than each argument as a standalone example of pretext, Plaintiff has, at best, proffered evidence that Defendants' policies and procedures are ill-conceived and at times contradictory. What is missing from Plaintiff's arguments and this record, and what is necessary to demonstrate pretext, is that a prohibited factor such as race was at least one of the motivating factors behind Defendants' decision to terminate Plaintiff. The record is devoid of such evidence and instead demonstrates that Defendants: (1) honestly believed Plaintiff stole overtime; (2) permitted Plaintiff to advance his explanations and justifications for his overtime requests in the same manner as other employees, whether Caucasian or African-American; and (3) investigated Plaintiff prior to the hearing in a similar fashion to the investigations carried out for Caucasian employees prior to their hearings.

Absent any evidence demonstrating or even providing an inference of pretext, the Court finds that Plaintiff's Title VII, NYSHRL, and § 1981 claims fail as a matter of law.

## III.    Federal Civil Rights Claims

Plaintiff's remaining claims allege violations of 42 U.S.C. §§ 1983, 1985, and 1986 arising out of the same set of operative facts. The Court discusses each in turn.

To prevail on any claim under § 1983, a plaintiff must show "(1) the deprivation of a right secured by the Constitution or laws of the United States, and (2) that the alleged deprivation was committed under color of state law." *Landon v. Cnty. of Orange*, No. 08 Cv. 8048 (CS)

(LMS), 2009 WL 2191335, at *4 (S.D.N.Y. July 23, 2009); *see also Chambliss v. Rosini*, 808 F.
Supp. 2d 658, 666 (S.D.N.Y. 2011). "Because the United States Constitution regulates only the
Government, not private parties, a litigant claiming that his constitutional rights have been
violated must first establish that the challenged conduct constitutes state action." *Fabrikant v.
French*, 691 F.3d 193, 206 (2d Cir. 2012) (quoting *Flagg v. Yonkers Sav. & Loan Ass'n*, 396
F.3d 178, 186 (2d Cir. 2005)).

Defendants argue that Liberty is not a state actor and that the conduct at issue is not fairly
attributable to the state, thus requiring dismissal of Plaintiff's § 1983 claim. (Defs.' Mot. at 23-
25.) Plaintiff's opposition to Defendants' motion fails to oppose these arguments in any way.
Accordingly, Defendants are granted summary judgment on this claim. *See Bellegar de Dussuau
v. Blockbuster, Inc.*, No. 03 Cv. 6614(WHP), 2006 WL 465374, at *7 (S.D.N.Y. Feb. 28, 2006)
(granting defendant summary judgment after plaintiff failed to oppose claim in its opposition to
motion for summary judgment).

Section 1985 prohibits two or more persons from conspiring for the purpose of depriving
any person of the equal protection of the laws or of equal privileges and immunities under the
laws. *See* 42 U.S.C. § 1985(3). To adequately plead a claim under § 1985(3), a plaintiff must
allege (1) a conspiracy; (2) for the purpose of depriving a person or class of persons of the equal
protection of the laws, or the equal privileges and immunities under the laws; (3) an overt act in
furtherance of the conspiracy; and (4) an injury to the plaintiff's person or property, or a
deprivation of a right or privilege of a citizen of the United States. *Hollman v. Cnty. of Suffolk*,
No. 06–CV–3589 (JFB)(ARL), 2011 WL 280927, at *11 (E.D.N.Y. Jan. 27, 2011) (citing *Mian
v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 7 F.3d 1085, 1087 (2d Cir. 1993)); *see Thomas v.
Roach*, 165 F.3d 137, 146 (2d Cir. 1999) (citing *Traggis v. St. Barbara's Greek Orthodox*

*Church*, 851 F.2d 584, 586-87 (2d Cir. 1988)). "A conspiracy is an agreement between two or more individuals, where one individual acts in furtherance of the objective of the conspiracy, and each member has knowledge of the nature and scope of the agreement." *Whitehurst v. 230 Fifth, Inc.*, No. 11 CIV. 0767 CM, 2011 WL 3163495, at \*5 (S.D.N.Y. July 26, 2011) (internal citation and quotation marks omitted). The plaintiff also must show "with at least some degree of particularity, overt acts which the defendants engaged in which were reasonably related to the promotion of the claimed conspiracy." *Simpson ex rel. Simpson v. Uniondale Union Free School Dist.*, 702 F. Supp. 2d 122, 133 (E.D.N.Y. 2010) (quoting *Thomas*, 165 F.3d at 146).

Plaintiff's opposition states in conclusory terms that he has demonstrated each of the elements of a § 1985 claim; assumes the existence of a discriminatory scheme; and asserts that he was unlawfully discriminated against based on his race. In addition to the fact that Plaintiff fails to make out a *prima facie* case of unlawful discrimination under Title VII, the NYSHRL, or § 1981, Plaintiff cites no evidence of an agreement between some or all of the Defendants to carry out the purported discriminatory scheme. The Court's review of the record likewise fails to yield any evidence of such an agreement. Absent an agreement, and thus a conspiracy, Plaintiff's § 1985 claim requires dismissal.

Section 1986 "creates a cause of action against anyone who, knowing that equal protection is about to be denied as a result of conspiratorial action, and having the power to prevent such wrong, fails to act." *Whitehurst*, 2011 WL 3163495 at \*7 (internal citations and quotation marks omitted). It "is contingent on a valid § 1985 claim." *Id.* Since Plaintiff's § 1985 claim has been dismissed, his § 1986 must be dismissed as well. *Id.* (citing *Graham v. Henderson*, 89 F.3d 75, 82 (2d Cir. 1996)).

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED. The Court respectfully directs the Clerk to terminate the motion at ECF No. 46, enter judgment in favor of Defendants, and close this case.

Dated:   March /6, 2016          SO ORDERED:
         White Plains, New York

                                 _____
                                 NELSON S. ROMÁN
                                 United States District Judge